[PHILADELPHIA, DECEMBER 31st, 1836.]

## NICHOLAS *against* ADAMS.

### IN ERROR.

1. To constitute a good *donatio causa mortis*, it is not necessary that the donor should be in such extremity as is requisite to give effect to a nuncupative will.
2. The making of a will after an alleged *donatio causa mortis*, is not conclusive against the donee.
3. Such gift may be evidenced by a writing not under seal.
4. On the 18th of October, 1832, A. then labouring under a complication of disorders, of which he died on the 1st of November following, delivered two watches to B.   On the 22d of October, A. executed a paper writing in the form of a will, by which he gave the two watches to B., "in whose possession" he proceeded "I myself placed said articles."   On the 29th of October, A. executed a will, by which he gave all his property absolutely to C.   *Held*, that B. was entitled to retain the watches.

THIS was a writ of error to the District Court for the City and County of Philadelphia, to remove the record of an action of trover, brought by Lewis Adams against Samuel Nicholas, to recover two gold watches.

On the trial before STROUD, J., on the tenth day of June, 1835, the plaintiff claimed the articles in question, under the will of one Moses Holmes, dated the 29th day of October, 1832; the defendant claimed to hold under an alleged *donatio causa mortis*, made by the same person on the 22d day of October, in the same year.   Moses Holmes died on the 1st day of November, 1832.   His disease was supposed to be *pulmonary* and *tracheal consumption*.   Dr. Tucker, who visited him once, stated that he was labouring under a complication of diseases, one of which was consumption; another a *tracheal paralysis*, which deprived him of the power of speech.   The plaintiff was a brother of the half blood of Holmes, and the defendant was an intimate friend.   On Sunday the 18th of October, 1832, Nicholas visited Holmes, and received from him, (as was supposed, though there was no evidence upon the point,) two gold watches—one of which he brought away with him—the other, though delivered to him by Holmes, was in consequence of some objections by Lewis Adams, left in Holmes' possession, and subsequently deposited in a trunk belonging to him and being in his sick chamber.   On the 22d of October, Nicholas in company with one Stephen Gloucester, called on Mr. Joseph Brewster, a member of the bar, and stated to him the circumstances connected with the supposed gift of the watches by Holmes on the day before;

(Nicholas v. Adams.)

and under his advice, with a paper writing which he prepared, Nicholas, Gloucester, and an individual named Glasgow, repaired to the house of Adams, and requested to see Holmes. Gloucester and Nicholas were admitted to his chamber.

The testimony of Stephen Gloucester, a witness on the part of the defendant, was as follows : " Holmes bowed his head and moved his hand to me as I came in, as he could not speak, and then pointed to the nurse for chairs for us to sit down. Nicholas remarked, he had but a short time to stay, and said, ' Mr. Holmes, I have come up to see you this morning about those watches which you gave me yesterday.' The nurse at this discovered some uneasiness, and said, his half brother (Adams) said he should not be disturbed. Nicholas pulled out the watch he had in his pocket, and he then told Mr. Holmes of a watch which was in a trunk, and which Adams had refused to let him take away yesterday. He told him he had brought me up to see him give those watches to him. Mr. Nicholas had a paper in his hand, which Mr. Brewster had drawn as an evidence of the gift, and he said he had brought me and Glasgow up to see whether this was what he meant. I read this paper to Holmes.

' This is the last will and testament of me Moses Holmes, made the twenty-second day of October, one thousand eight hundred and thirty-two. I revoke all former wills by me at any time heretofore made concerning the articles herein devised.—Item, I give and devise both my gold watches, one of which is carved and the other plain, and the gold chain attached to the plain watch, unto my well beloved friend Samuel Nicholas, of the county of Philadelphia, clothier, in whose possession I myself placed said articles.

" In witness whereof I have hereunto set my hand and affixed my seal, this twenty-second day of October, in the year of our Lord one thousand eight hundred and thirty-two.

his<br>
Moses ⋈ Holmes.<br>
mark.

Witness present at
   the signing,
     S. H. Gloucester.'

I read this paper to Holmes, who did not seem to understand it. He made several signs; I then said to him, ' if you die Nicholas is to have the watches; if you recover they are to be returned to you.' Holmes by sounds and signs expressed his assent. I gave him this as the interpretation of the paper. I asked that Glasgow should be brought up. The nurse would not permit it; and said that Holmes had given *him* that watch yesterday. Holmes at this shook his fist at the nurse. Then Nicholas said to Holmes, ' if this is your will, will you sign this paper ?' Ink was produced, and Nicholas handed

him a pen. Holmes put the paper on his knee and went to make the mark. His hand trembled very much; Nicholas took hold to steady it. Nurse and I both objected to this. Holmes shook the pen at the nurse to hush. Holmes then undertook to put the pen to the paper again, and then dropped the ink now on the paper. The lawyer told us, that Nicholas might guide his hand. The nurse remarked, Holmes did not make the first mark. I then stept forward, and said to Holmes, 'You have made a blot here. Now make a mark yourself.' He then made the mark now there, and I turned around to the nurse, and said, 'are you satisfied now?' She said, 'yes.' Holmes pointed to his trunk—it was lifted up to him. He got his keys, several of them, handed them to me, having selected one with which I unlocked the trunk. Holmes took out the watch and handed it to Nicholas."

The plaintiff at the opening of his case, gave in evidence the will of Moses Holmes, dated the 29th of October, 1832, and duly proved before the register of wills, shortly after Holmes' decease, which gave to him absolutely, all the testator's property.

The Court charged the Jury as follows:

"The defendant in opening his defence claimed these watches as gifts *causa mortis*. (The judge then stated the testimony.) The plaintiff's counsel have declined addressing you; I will assume the facts to be precisely in accordance with the defendant's statement of them, and in point of law, on that statement, the plaintiff is entitled to your verdict. My opinion is founded upon the fact, that the will under which the plaintiff claims, was made subsequent to the alleged gift of the watches to the defendant. Whether a subsequent will revokes a prior gift *causa mortis* is a question undecided. I do not say therefore, that a subsequent will operates as such revocation, but I do say, that the fact of a will having been made subsequent to the alleged *donatio causa mortis*, regularly proved before the register and not impeached on the trial, is conclusive evidence that the gift was not made during such a last sickness, as the law requires to constitute a disposition of property *causa mortis*; and that even if at the time of the gift, the sickness was such as to induce the donor to believe, and he did believe, that he was very near his death, and had not time to make a disposition of his property by will, yet if afterwards, and after the lapse of more than six days a will in writing should be made by him and duly proved after his death, and not impeached on the trial, this is conclusive evidence, that the donor had escaped from the peril of death, which he supposed to impend over him when he made the donation; and it cannot take effect as a *donatio causa mortis*."

The defendant's counsel excepted to this charge; and a motion

(Nicholas *v.* Adams.)

for a new trial, having been denied by the court below,* removed the record to this court, where the following errors were assigned.

" 1. The judge erred in stating, that the *fact* of a will being made subsequent to the alleged *donatio causa mortis*, regularly proved before the register, and not impeached on the trial, was *conclusive* evidence that the gift was not made during such a last sickness, as the law requires, to constitute a disposition of property *causa mortis.*

2. The judge erred in stating, that even if at the time of the gift the sickness were such as to induce the donor to believe that he was very near his death, and had not time to make a disposition of his property by will, yet, if after the lapse of six days a will in writing should be made, this was conclusive evidence, that the donor had escaped from the peril of death, and it could not take effect as a *donatio causa mortis.*"

Mr. *Hazlehurst* and Mr. *D. P. Brown*, for the plaintiff in error.

There are three requisites to a good *donatio mortis causa;* 1st, It must be of a personal chattel; 2d, It must have been made during the last sickness of the donor, and in the apprehension of death; 3d, There must have been an actual delivery.

In this case, the first and last of these requisites are admitted on the opposite side to exist. Two questions are in dispute here. 1st, Is it necessary that the donor should be *in extremis* at the time of the gift? and 2d, Was the gift in this case revoked or determined by the will of the 29th of October, 1832?

1. There are only three cases upon this subject in our reports; one of which was in Pennsylvania, *Wells* v. *Tucker*, (3 *Binn.* 169.) In that case the donor lived three days after the gift. The English cases are numerous; and in many of them, the gift was a long time before the death of the giver. The earliest case is *Hedges* v. *Hedges*, in 1708, (*Prec. in Chan.* 269;) which was reversed in the House of Lords. (1 *Br. P. C.* 254.) The next was *Jones* v. *Selby*, (1 *Br. P. C.* 300,) in which it appears that the *donatio* was three years before death; though the point does not appear to have been made. In *Lawson* v. *Lawson*, (1 *P. Wms.* 441,) the donor died seventeen days after the gift. In *Hassel* v. *Tynte*, (*Ambler*, 318,) six weeks afterwards. In *Hill* v. *Chapman*, (4 *Br. Ch. Rep.* 612,) the gift appears to have been made while the donor was in perfect health. In *Walker* v. *Hodge*, (2 *Swanst.* 97,) it is said to be sufficient if the *donatio* is made in contemplation of death. In *Bunn* v. *Markham*, (7 *Taunt.* 224,) there was an interval of one year. There are several

---

* For the opinions of the Judges of the District Court, upon the motion for a new trial, see 1st Miles's Reports, 90.

other English cases, which negative the idea that it is necessary that the donor should be *in extremis.* *Hurst* v. *Beach,* (5 *Madd. C. R.* 351.) *Tate* v. *Hibbert,* (2 *Ves. jr.* 111.) *Blount* v. *Burrow,* (2 *Br. Ch. Rep.* 71.) Indeed the very condition of the gift, viz., that it shall be returned if the donor recovers, seems to contradict this supposition. Now in this case, the evidence shows that the donor was in his last sickness; that he was in great peril; that his end was rapidly approaching, and that he made the gift in expectation of death: and he died within two weeks afterwards.

Mr. *G. M. Wharton* and Mr. *J. C. Biddle,* for the defendant in error.

There is no evidence of what passed between the testator and Nicholas on the 18th of October. After that day he was unable to make himself understood distinctly. Upon the facts as exhibited by the record, there is nothing to induce the court to lean in favour of the alleged donee. After having endeavoured to establish his claim as a will, he cannot be allowed to set it up as a *donatio mortis causa.* The writing executed on the 22d of October, must be deemed a will; and if so, it was revoked by the general will, executed seven days afterwards. It is true that Lord HARDWICKE has said, that a *donatio mortis causa* may be in writing; but in the only case mentioned by him, the instrument conferring the gift was held to be a will. In the 9th volume of the London Law Magazine, page 326, is a learned essay on the subject, which may be cited as evidence of the sense of the profession, and in which it is expressly said, that "by the law of England a *donatio mortis causa* is made by parol only." (Page 344.) The elementary writers, Roper and Williams, are not supported by the authorities cited when they lay it down that a *donatio* is not revoked by a subsequent will. In the recent case of *Hambrooke* v. *Simmons,* (4 *Russel,* 25.) it is made a *quære* whether such gift is avoided by a will or codicil subsequently made. It is laid down in many books, that a *donatio* is not good unless made while the donor was *in extremis.* In this case he lived fourteen days after the supposed donation. Upon the ground of policy, the courts ought to lean against encouraging this kind of nuncupative will, since they open the door to great frauds upon sick men, and are likely to defeat the intention of the legislature in respect to the legacy duties. The following authorities were cited and commented upon in the course of the argument. 2 *Kent's Comm.* 358, 360, (last ed.) *Yarnall's case,* (4 *Rawle,* 46.) 1 *Jacob's Law Dict. tit. Donatio, &c.;* 2d, *Jacob tit. Will.* *Miller* v. *Miller,* (3 *Peere Wms.* 356.) *Snelgrove* v. *Bailey,* (3 *Atk.* 214.) *Smith* v. *Smith,* (2 *Strange,* 955.) *Hill* v. *Chapman,* (2 *Br. Ch. Rep.* 602.) *Blount* v. *Burrow,* (4 *Br. Ch. Rep.* 72.) *Tate* v. *Hibbert,* (*Id.* 286.) *Walton* v. *Hodge,* (2 *Swanst.* 97.) *Gardner* v.

(Nicholas v. Adams.)

*Parker*, (3 *Madd. Rep.* 84.)    *Fink* v. *Cox*, (18 *Johns.* 145.)    *Wright* v. *Wright*, (1 *Cowen*, 598.)

At all events, even if the court below was wrong in respect to the law, yet if upon the whole case, the plaintiff is entitled to recover, the court will not reverse the judgment: To which point many cases were cited.

The opinion of the court was delivered by

GIBSON, C. J.—Perhaps the best definition of this species of donation in the books of the civil law, and the one which best corresponds to the best impressions the subject has received from the Anglo-Saxon jurists, who seem to be returning to the point from which they started—is, that which is found in *Justinian's Institutes, Lib.* 2, *Tit.* 7: " *Mortis causa donatio est, quæ propter mortis fit suspicionem; cum quis ita donat, ut si quis humanitus, haberet is qui accepit; sin autem supervixesset, is qui donavit reciperet, vel si eum donationis pænituisset, aut prior decesseret is cui donatum sit.*" Not a word in any part of this about sickness, first or last. Contested death-bed donations are of such occurrence in the courts, as to have superseded all others, and to have grown, in the apprehension of the judges, from a species to a genus; and hence the notion that they are referable exclusively to death-bed sickness. If made in sickness, it must necessarily be the last sickness; for the contingency happens adversely to the donee, where the donor is restored to health. But this notion seems to be yielding to more comprehensive principles. In his *Treatise on Legacies,* page 26, Mr. Roper, whose accuracy as a text-writer is creditable to him, says, it is necessary that the gift be made in peril of death, *or* during the donor's last illness, and to take effect only in case he die. This would be critically correct, were it not redundant in one particular, and too narrow in another; redundant, because it is indifferent whether the peril of death be induced by sickness or any other cause. Thus, the peril past, the gift of a soldier or a malefactor might be retracted, though made in perfect health, when going to execution or to battle. But his position is also too narrow in one particular; for a groundless apprehension of death is necessarily as operative to make a gift conditional, as if the danger were real. No one would hesitate to say that the gift of a man in the predicament of Parolles, when sportively doomed by his friends, in the guise of ferocious enemies, might be recalled. I would, therefore, briefly define a *donatio causa mortis* to be a conditional gift, dependent on the contingency of expected death. There may, doubtless, be a conditional gift, when death is not expected; but in that case the condition would have to be expressed, and the contingency specified; in the *donatio causa mortis,* both are implied from the occasion. But it is certainly not requisite that the donor be in such extremity as is

(Nicholas *v.* Adams.)

requisite to give effect to a nuncupation, which is sustained from necessity merely, where the donor was prevented by the urgency of dissolution, from making a formal bequest. Between these ways of disposition, there is not one approximating line. *Donatio causa mortis* is sometimes spoken of as being distinct from a gift *inter vivos*; the former having sometimes been supposed to be made in reference to the donor's death, and not to vest before it—but inaccurately, as it seems to me; as this gift, like every other, is not executory, but executed in the first instance, by delivery of the thing, though defeasible by reclamation, the contingency of survivorship, or deliverance from the peril. The donee would certainly not be bound to make compensation for the intermediate use of the thing; and evidently because the intermediate ownership was vested in him. The gift is consequently *inter vivos*. All agree that it has no property in common with a legacy, except that it is revocable in the donor's lifetime, and subject to his debts, in the event of a deficiency. The first is, not because the gift is testamentary, but because such is the condition annexed to it; and the second, not because it is in the nature of a legacy, but because it would otherwise be fraudulent as to creditors; for no man may give his property, who is unable to pay his debts. It is decisive, that the subject is not within the jurisdiction of the ecclesiastical courts; and the donee, consequently, takes paramount to the executor or a legatee. For this reason it is, that a subsequent will which becomes operative, only when the period of reclamation is past, and when the gift has become absolute by the event of the contingency, is not an effective act of revocation. I therefore cannot subscribe to the doctrine, that the making of a subsequent will is conclusive evidence of the gift having not been made during such a last illness as the law requires; and that if the degree of sickness were such as to induce an expectation of immediate death, the subsequent making of a formal will is conclusive that the donor had escaped from the peril of death which he supposed to impend at the time of the gift; and that under these circumstances, it cannot take effect as a *donatio causa mortis*. The direction to this effect, was obviously produced by an impression that this sort of gift is but a species of nuncupation, which is sustainable only as an equivalent for a legacy, and only where a formal testament could not be made; that it is annulled by deliverance, not from mortal peril, but from the apprehension of it; and it assumes that no one would make a conditional gift who could make a testament: conclusions in which we do not concur. To say nothing of the fallacy, that the making of a will indicates even a respite from sickness or the apprehension of death, a disposition by *donatio causa mortis* is not to be disturbed by the alternation of hope and dispair, dependent on the doubtful spinning of the die, but only by the turn up of life. Were it otherwise, the gift in the present instance would be void in its creation without regard to the

subsequent will, inasmuch as it was accompanied by a paper, which but for the delivery of the thing given, would be itself a will. Indeed it has been surmised that the gift was testamentary notwithstanding the delivery, and consequently revoked by the subsequent will. But though bearing a testamentary form, it is evident both from the context and the extrinsic proof, that the writing was designed only for evidence of a present gift. A delivery of the thing, accompanied by an oral expression of the same words, would certainly not have made a nuncupation; and the reduction of the words to writing cannot change their effect. They are precisely such as would be used by a man unaccustomed to technical language, with a view to constitute a *donatio causa mortis.* The law looks to substance, and here the recital of delivery in the paper itself, is decisive of its character; for no man thinks of giving by will and performing the office of his own executor. In *Tate* v. *Hibbert,* (2 *Ves. jr.* 111,) Lord LOUGHBOROUGH inclined to think this species of donation might be effected by deed or writing, without delivery, though not by parol; but he certainly could not have meant an unsealed writing which, it has been finally settled, is still but parol, and requires the same consideration. He determined in the very case, that a voluntary promissory note, or banker's check, cannot be sustained as a *donatio causa mortis,* because not an actual transfer of specific money; and the principle has been repeated in *Parish* v. *Stone,* (14 *Pickering,* 198.) Indeed it would seem to be impracticable even by deed, which, though it may obviate an objection to want of consideration, amounts, without delivery, only to a covenant which passes no title to a specific thing. But where the gift is executed, both the terms of it, and the fact of delivery, may be evidenced by writing, whether sealed or not.

But if the gift were not a *donatio causa mortis,* what title would that give the executor or a legatee? Whether absolute or conditional, it is good against the donor's representative by title subsequent. The condition is for the benefit of the donor; and here the evidence, written or verbal, shows a gift of some sort, which consequently must be taken to have been absolute in the first instance, if it were not conditional by the terms of the writing, or by implication from the nature of the occasion. It is an elementary definition of a gift, that it is a transfer of the title, of which, though the gift be in writing, delivery of the thing is the strongest and most essential evidence. It is a contract executed, which requires no consideration; and I am unable therefore to comprehend what is meant by a remark found in the books, that these donations cannot be supported by the general consideration of mortality. It never has been decided that any consideration is necessary; nor could it be, without violating a common rudimental principle. "A true or proper gift," says Sir WILLIAM BLACKSTONE, "is always accompanied with delivery of possession, and takes effect immediately: as if A. gives B. £100, or a flock of

(Nicholas v. Adams.)

sheep, and puts him in possession of them immediately, it is then a gift executed in the donee; and it is not in the donor's power to retract it, though he did it without any consideration or recompense. But if the gift does not take effect by an immediate delivery of possession, it is then not properly a gift but a contract; and this a man cannot be compelled to perform but upon good and sufficient consideration." (2 *Comm.* 441.)    Indeed if it were not gratuitous, it would be an exchange or a sale.    The error of the court below seems to have had its root in a notion that this species' of donation is to be treated not as a gift *inter vivos,* but as a testamentary disposition, subject to restrictions like those of nuncupation, and taking effect for the first time at the donor's death; to countenance which, there is certainly much in the loose and confused *dicta* of the English jurists.    Here the donor certainly made a gift, having power to do so   on whatever condition he might choose to prescribe, or without condition at all; for no one will say that a man is competent to reserve a condition, only in the extremity of his last sickness. Even if the condition were void, the gift would be good.    Yet it was not void ; but the gift became absolute by the happening of the contingency.    In its circumstances, the case fulfils all the indications in the  concluding part of the paragraph in the Institutes, of which I have already extracted the beginning.   " *Et in summa, mortis causa donatio est, cum magis se quis velit habere, quam eum cui donat; magisque eum cui donat, quam hæredem suum.*"    It will not be said that the donor did not so give as to evince that he would himself rather possess the thing, than that the donee should possess it ; and yet that the donee should possess it, rather than the donor's legal representative.    The gift was therefore perfect as a *donatio causa mortis.*

Judgment reversed.