Hawkins, J.,
delivered the opinion of the Court.
This cause was heard upon bill and answer, in the Chancery' Court at Greeneville. A decree was pronounced, dismissing complainant’s bill; from which, he has appealed to this Court.
The bill charges, that some time in the month of August, 1862, one George Carter was forced to leave his home, to avoid the operations of the rebel conscription laws, then being enforced in East Tennessee, and went to the State of Kentucky, where he joined the Union army, and from whence he never returned, having died at Louisville, in that State, in 1863.
*290 The bill further charges, that, at the time he left his home, as before stated, said Carter placed in the hands of one Daniel Simpson, for safe keeping, and until such time as he could return home, an amount of money, notes of hand, and other valuable papers, the precise sum and description of which, the complainant did not know and could not give. The bill further charges, that, as complainant had been informed, said money, notes and receipts, had been delivered to one Peter Myers, as guardian of George M. Simpson, a minor child of said Daniel Simpson, and of his wife, Mary, who was the sister of said Carter; and that the same was, by these parties, wrongfully detained and withheld from complainant, who had been appointed and qualified as the administrator of the estate of said Carter, deceased.
Daniel Simpson and his wife, Mary, and Myers, as guardian of George M. Simpson, were made parties defendant, and the prayer of the bill is, that they may be. required to answer all the material allegations contained in the bill, acording to the practice of a Court of Chancery, “and that they show cause, wherefore they, or any of them, detains the same from complainant’s control and disposal, as administrator as aforesaid,” and that the same be surrendered to complainant, etc.
The answers of Simpson and wife, state, that said Carter left his home, or the house of respondents, on the 12th of August, 1862, to go to the State of Kentucky, for the purpose of joining the Pederal army, which he did, as they are informed and believed, and died at Louisville, on the 2d day of January, 1868, intestate, leaving neither wife or children.
*291 That on the day before he left, at respondents’ house, he placed in the hands of respondent, Mary Simpson, $190 in gold, and $144 in paper money, together with some notes, receipts, etc., and stated to her at the time, “if he never returned, he wanted it all to he given to her son, George M. Simpson,” who was, at that time, some six years old; and on the day he left, he stated to respondents, that if , he never returned, he wanted “little George” to have what he had left in respondents’ hands.
Respondents say, they procured the appointment of Myers as guardian for their son, and admit they delivered said money, notes, etc., to said guardian, and deny the right of complainant to any portion of the same.
The defendant, Myers, answers, and says he had been appointed guardian for George M. Simpson, at the instance of his parents, who delivered to him said money, notes, etc., and represented to him, the same had been left in their hands by George Carter, deceased, for their son, George M., and that he now holds the same, as guardian.
The bill was filed September 16th, 1865. The answers were filed 25th November, 1865. At the following May Term of the Court, 1866, the cause was set for hearing by the Master, and by consent was continued “and left open on both sides,” as appears from the record. And at the following September Term, nearly one year 'after the answers were filed, the cause was finally heard, and the bill dismissed.
Two questions are presented in argument. It is insisted, the matters stated in the answers of Simpson and *292 wife, showing by what right they detained said money and notes from complainant, and paid the same to their co-defendant, Myers, is not responsive to the allegations or interrogatories in the bill, and are, therefore, matters in avoidance, and must be proved. While it is insisted, on the other side, that, in this respect the answers are responsive to the bill, and therefore need not be proved. The bill expressly calls upon the defendants to answer, and “to show cause wherefore they, or any of them, detain the same (said money, notes, etc.) from complainant’s control and disposal, as administrator aforesaid," and is equivalent to the direct interrogatory propounded to them, by what right, title or authority they withheld said money, notes, etc., from the complainant; and therefore the answer to such interrogatory is evidence, and not merely matter in avoidance: 5 Humph., 446; 10 Yerger, 105; 2 Daniel’s Chancery Pleading and Practice, 938, note 2. This brings us to the consideration of the second question.
It is insisted in argument, by the solicitor for the defendants, that the facts thus established, constitute a. valid donatio causa mortis of the money, notes, etc., to G-eorge M. Simpson, the nephew of the intestate, and consequently defeat the rights of the complainant.
The subject is one of unusual interest, and one, the investigation of which, furnishes a wide field for the display of legal learning; but we will be content with the simple effort to ascertain, if we can, from the many authorities to which we have been referred, what is necessary to constitute a valid gift of this character.
It will be remembered, in the outset of this investi *293 gation, that the English Law upon this subject, is wholly derived from the Roman, or Civil Law, in which, as Lord Chancellor Hardwicke said, in the case of Ward vs. Turner: “there is great variety, and several passages which it is difficult to reconcile.” But, according to Swinburne and Voet, by the Roman Law, donations mortis causa, are divided into three kinds:
1st, Where a person, not terrified by the apprehension of any present peril, but moved by the general consideration of man’s mortality, makes a gift.
2d, Where a person, moved by imminent danger, gives in such a manner, that the subject is immediately made his to whom it is given.
3d, When a person, being in peril of death, gives something, though not so that it should be presently his who received it, but in case only the giver dies.
A question seems to have arisen at an early day, over which there was much contest as to the real nature of gifts causa mortis. Were they gifts inter vivos, to take effect before the death of the donor, or were they in the nature of a legacy, taking effect only at the death of the donor.
At the termination of this contest, it seems to have been settled, that a gift mortis causa, is ambulatory and incomplete during the donor’s life, and is, therefore, revocable by him, and subject to his debts, upon a deficiency of assets — not because the gift is testamentary, or in the nature of a legacy, but because such is the condition annexed to it, and because it would otherwise be fraudulent as to creditors; for no man may give his property who is unable to pay his debts; and all now *294 agree that it has no other property in common with a legacy. The property must pass at the time, and not be intended to pass at the giver’s death; yet, the party making the gift, does not part with the whole interest, save only in a certain event; and until the event occurs which is to divest him, the title remains in the donor. The donee is vested with an inchoate title, and the intermediate ownership is in him; but his title is defeasible, until the happening of the event necessary to render it absolute. It differs from a legacy in this, that it does not require probate, does not pass to the executor or administrator, but is taken against, and not from, him. Upon the happening of the event upon which the gift is dependent, the title of the donee becomes, by relation, complete and absolute from the time of the delivery, and that without any consent, or other act, on the part of the executor or administrator, consequently, the gift is inter vivos.
We mention this contest, and the results attending it, for the purpose of showing, as we will hereafter attempt to do, that much of the apparent conflict of authority, touching the question now under discussion, has grown out of the different opinions formerly entertained by able jurists, as to the real nature of a donatio causa mortis; and that the opinions of those who insisted the gift only took effect at the death of the donor, and was, consequently, in the nature of a legacy, and to be valid, must be made under such circumstances as would render valid a nuncupation, have now no force or application, whatever.
In treating of the several kinds of gifts causa mortis, *295 as recognized by the Roman law, Mr. Roper says: “It appears, upon consideration, that the third before mentioned is the proper donation causa mortis — the other two being nothing more than pure irrevocable gifts inter vivos.”
Lord Chancellor Hardwicke, in speaking of this third kind of gift, in the case of Ward vs. Turner, thus defines it: “Where a person, though he was moved with the danger, yet not thinking it so immediate as to vest the property immediately in the person, but put it in the possession of the person, as an inchoate gift, to take effect in case he should die.”
Mr. Roper, in his treatise on Legacies, vol. 1, p. 3, says: “ The circumstances required for the constitution of a donatio mortis causa, are, as before appears: 1st, That the gift be made by the donor in peril of death, or during his last illness, and to take effect in case only the giver die.”
In commenting upon this definition, Chief Justice Gibson, in a very learned and able opinion, in the case of Nicholas vs. Adams, 2 Whart., 17, 22, says: “ This would be critically correct, were it not redundant in one particular, and too narrow in another. Redundant, because it is indifferent whether the peril of death be induced by sickness, or any other cause — thus, the peril of death passed, the gift of a soldier or malefactor, might be retracted, though made in perfect health, when going to execution or to battle. But this position is, also, too narrow in one particular; for a groundless apprehensien of death is, necessarily, as operative to make a gift conditional, as if the danger were real.”
*296 And in the same case, evidently combating wbat he considered an erroneous idea, and which, for reasons before stated, had prevailed to a great extent — that to make a valid gift eausa mortis, it must be made in extremis, and under such circumstances as are requisite to give effect to a nuncupation, which is sustained, from necessity, merely when the donor was prevented from making a formal bequest, by the urgency of dissolution — an idea which, as we have before shown, grew up under a mistaken apprension of the true nature of a gift causa mortis — the learned Judge says: “Perhaps the best definition of this species of donation, in the books of the civil law, and the one which best corresponds to the best impressions the subject has received from the Anglo-Saxon jurists, who seem to be returning to the point from which they started, is, that which is found in Justinian’s Institutes, Lib. 2, Tit. 7, which is as follows: “Mortis causa donatio est, quce propter mortis fit suspicionem; cum quis ita donat, ut, si quid humanitus ei contigisset, haberet is, qui aecipit; sin au-tem supervixisset, is, qui donavit, reciperet; vel si eum do-nationis poenituisset, aut prior decesserit is, eui donatum sit.” The learned Judge, after making this quotation from Justinian, continues: “Not a word in any part of this about sickness, first or last. Contested death-bed donations are of such occurrence in the Courts, as to have superseded all others, and to have grown, in the apprehension of the Judges, from a species to a genus; and hence the notion that they are referable exclusively to death-bed sickness. If made in sickness, it must, necessarily, be the last sickness; for the contingency hap *297 pens adversely to the donee, when the donor is restored to health. But this notion seems to he yielding to more comprehensive principles.”
Now, in case of a conditional gift, when death is not expected, the condition must be expressed, and the contingency upon which it is to take effect, specified. But, in case of a gift causa mortis, both the condition and the contingency are implied from the occasion, and need not he expressed or specified. Hence, if the danger or peril he passed, or if made in sickness, the donor recover from his illness, or if he resume the possession of the gift, it will he defeated. The Judge, in the before mentioned case of Nicholas vs. Adams, after reviewing the authorities upon the subject, says: “I would, therefore, briefly define a donatio causa mortis, to be a conditional gift, dependent upon the contingency of expected death.”
Mr. Kent, vol. 2, p. 444, says, in discussing this question : “ Such gifts are conditional like legacies, and it is essential to them, that the donor make them in his last illness, or in contemplation and expectation of death, and with reference to their effect after his death; and if he recovers, the gift becomes void. The apprehension of death may arise from infirmity or old age, or from external and anticipated danger.”
These donations in effect, amount to a revocation pro tanto of written Wills; and not being subject to the forms prescribed for nuncupative Wills, they are certainly of a dangerous character, and too much care cannot he taken in insisting upon the most convincing evidence of the gift; hence, all the authorities agree that *298 delivery is essential to tbe validity of the gift, and that, it is said, is a wise principle of our laws, because delivery strengthens the evidence of the gift; and is certainly a very powerful fact for the prevention of frauds and perjury.
It is, however, not necessary that the delivery be to the donee. It is sufficient if it be to another for him.
After a review and careful analysis of all the authorities to which we have had access, we conclude that upon principle and in accordance with what seems to' be the weight of authority, the essential requisites of a donatio causa mortis, are, that it be made during the sickness of the donor, or whilst under the belief that he is in peril of death, or surrounded by threatened dangers from which he has an immediate existing apprehension of death, and in contemplation of death from such sickness, peril or danger, is thereby moved to make the donation.
But we do not mean by this, that the donor must be in extremis, or moved by the apprehension of immediate death, but the apprehension itself must be immediate. A general apprehension of death from the mortality of man will not be sufficient, but it must be an apprehension arising from the particular sickness, peril or danger.
Now let us apply these principles to the facts of this case, and see how the rights of the parties stand.
The donor was compelled to leave his home in consequence of the rebel conscription, then being enforced in East Tennessee, in order to avoid giving service to the rebellion, then being waged against the Government *299 of the United States, and to avoid the .perils of death, and the dangers to which he would be exposed in such service. He resolved to flee from the dangers bj which he was then surrounded, and from which he may have justly apprehended death, and brave the dangers and perils of death, which every one at all familliar with the bloody history of the times knows to have been imminent, in an eifort to escape from the midst of those who were hunting him with arms in their hands, for the purpose of enforcing a rigid and merciless conscription. He had also resolved that if he escaped from the immediate dangers by which he was surrounded, he would join the Union army, then in the State of Kentucky, in the capacity of a soldier. _ And in view of these perils and dangers, and under the apprehension of death engendered by them, as well as the anticipated dangers, which hung in clusters all along his pathway, and which must be encountered in the accomplishment of his undertaking, and being moved thereby at the time he started from home on this perilous enterprise, with a clear appreciation of the dangers, he made a gift of the money, notes, &c., now in controversy, to his nephew, George M. Simpson, to take effect upon condition he never returned; and delivered the same to his sister, the mother of George M., to be delivered to the donee upon the happening of the contingency upon which the gift was made to depend. The gift was clearly intended to become absolute, only upon the death of the donor. The donor made his escape to the lines of the Union army, became a soldier, and died without ever having returned to his home.
*300 We are of the opinion, the facts in this case constituted a valid donatio causa mortis, of the money, notes, &c., to George M. Simpson; and consequently the complainant has no right to recover the same.
The decree of the Chancellor dismissing the hill will he affirmed.