# Michener *versus* Dale.

1. A *donatio causa mortis* is a gift of a chattel made by a person in his last illness or in *periculo mortis*, subject to the implied condition that if the donor recover, or if the donee die first, the gift shall be void.

2. Delivery is indispensable, but whether to the donee immediately or to another person for him, is immaterial.

3. Though the property which is the subject of the gift be the principal part of the donor's property, the gift is not on that account invalid.

4. When a chattel has been given *causa mortis*, and possession delivered and the death of the donor immediately ensue, no title to the chattel descends to the administrator, and he has no right to the possession of it for the purposes of administration. The donee, however, must account for its value if creditors appear and there be not other estate sufficient to pay their claims.

5. If the administrator has received the chattel which was the subject of the *donatio causa mortis* and converted it, the donee may maintain *assumpsit* against him.

6. Where the gift was to two persons jointly they could sue jointly for its value.

7. A person at sea, being seized with cholera, sent for the purser, and in his presence, holding in his hand a bag of gold dust and some pieces of coin, requested a sailor in attendance to hand it to the purser, which was done. The latter inquired who he wished to have *his effects.* To which the former replied his sister and brother residing in Philadelphia. The purser further testified that the gold dust and coin were given to him in presence of the donor and at his request, and he wished his brother and sister to have it. About six hours after the occurrence the sick man died of the said disease. *Held,* that this was a *donatio causa mortis* in favor of the brother and sister.

8. The property having been received and converted by the administrator of the donor's estate, the brother and sister could jointly maintain *assumpsit* for its value.

ERROR to the District Court, *Philadelphia.*

This was an action of *assumpsit* by Samuel E. Dale and Elizabeth Jane Dale against John G. Michener, to recover the value of 109¼ ounces of gold dust, and some coin, the latter amounting to about $22.60.

The plaintiffs claimed by virtue of an alleged *donatio causa mortis*, made by their brother James E. Dale, who died on board the steamer Panama, at sea, in the Pacific Ocean, in August, 1850. He had been a sailor, but leaving that employment he went to California and worked as a miner. He died on his voyage from San Francisco to Panama. Immediately before his death, he had in his possession the gold dust and coin. These were afterwards delivered to the Consul at Panama, by whom the gold dust was converted into money, and remittance made to Michener, the defendant, who, at the instance of the father of Dale, had received letters of administration, at Philadelphia, on the estate of the deceased. The amount received was claimed by the plaintiffs, who were the brother and sister of the decedent.

It was said that the gold dust and coin were the whole estate of Dale except his clothing, at the time of his death.

On the trial, it appeared from the deposition of M. Lent, the purser of the steamer Panama, that James E. Dale, about six hours before his death, sent for Lent to see him. Lent went to him. He was in the steerage of the boat, with a man who appeared to be a sailor, also a steerage passenger. Dale was sick with cholera, and the man was attending to him. Dale had in his hands, loose, some coin, and a bag of gold dust tied up. He told the sailor to give the bag and coin to Lent, which he did. "In answer to questions put to him by" Lent, "he said his name was James E. Dale; that he was twenty-six years of age; that he was not married." Lent "asked him, *who he wanted to have his effects ?* He said, *his sister and brother.*" Lent "asked him where they lived? he replied, in Philadelphia; *and that was all he said.*" In answer to subsequent interrogatories, he said, "the gold dust and coin was given to me in the presence of James E. Dale, and at his request,

[Michener v. Dale.]

and *he wished his brother and sister to have it;*" and "James E. Dale did not inform me that he had any property, otherwise than by directing the sailor to deliver to me the bag of gold dust and coin, and by saying, *that he wished it to go to his brother and sister.*"

By the same deposition it appeared that Dale died about six hours after the said conversation, of the cholera, with which he was then suffering.

It was also testified by a witness that *he* gave to the said James E. Dale about fourteen ounces of gold dust, to bring to the witness's family in Philadelphia. It appeared that a suit had been brought against the defendant as administrator, for the value of the said 14½ ounces of gold dust.

On the part of the defendant points were submitted.

The judge, *inter alia*, charged that if the jury found that Dale was dangerously ill, and believed he was about to die, and then expressed his desire that the gold dust and coin should become the property of his brother and sister in the event of his death, and that the same was delivered to Lent to be delivered by him to them, and that his intention was that this property and no more should be given to his brother and sister; and that Dale died within a few hours after, of the sickness with which he was then suffering, in such event the plaintiff could recover the amount received by the defendant.

But, that, if the jury found that when the gold dust and coin were put into the hands of Lent, by direction of Dale, the intention of the latter was, that all his effects whatever they might be, and not merely the gold dust and coin, should become the property of the plaintiffs, then the verdict should be for the defendant.

The *third* point submitted was, that if the proceeds of the gold dust received by the defendant was *the whole* of Dale's estate, he could not dispose of it by a gift which would take effect as a *donatio causa mortis*. As to this point, the judge charged that it was correct, but that he reserved the point.

Verdict was rendered for the plaintiffs.

A number of specifications of error was made; the first three were to the admission of the testimony of Lent; the fourth was to the charge; the fifth was to leaving it to the jury to determine the meaning of the words used by Dale, which were alleged to constitute the *donatio causa mortis*. 6. In leaving it to the jury to determine his *intention*. 7. That if the plaintiffs were entitled to the proceeds of the gold dust, their remedy was *several* and not joint. 8. That the evidence was not sufficient to establish a *donatio causa mortis*. 9. That if the gold dust was the *principal part* of Dale's property, he could not dispose of it in the manner in question. 10. That a *donatio causa mortis* is subject to the

F

[Michener *v.* Dale.]

debts of the deceased; and if it be necessary to pay the debts, the administrator was entitled to retain the proceeds for that purpose.   11. That being liable for debts, the administrator is entitled to retain it until all claims are ascertained and settled.   12. If there was in this case, a gift of the gold dust, the remedy of the plaintiffs was for the balance after settlement of the administrator's accounts.   13. That the plaintiffs could not recover in this action. 14. In reserving the third point charged upon.   It was intimated in the argument that from the point being reserved the jury might have considered it doubtful.

*T. S. Smith,* for plaintiff in error.

*Thayer,* for defendants in error.

The opinion of the Court was delivered by

WOODWARD, J.—James E. Dale, a native of Philadelphia, and a bachelor, having lived several years in California, embarked at San Francisco in the month of August, 1850, for Panama, on board a steamship. On the voyage, between Acapulco and Panama, he was seized by cholera. He sent for the purser of the ship, Mortimer Lent, who when he came found Dale lying dangerously ill, on the steerage deck. A sailor was in attendance upon him. The sick man held in his hands a buckskin bag of gold dust, and some pieces of coin, together amounting in value to $1770.60, which he handed to the sailor, and requested him to deliver them to Mr. Lent, which was done on the spot. In answer to questions put to him by Lent, he said his name was James E. Dale; that he was 26 years old; that he was not married. Lent asked him who he wanted to have his effects ? He said his sister and brother, residing in Philadelphia. This, says Lent, was all he said; but on further examination, the witness stated, " the said gold dust and coin were given to me in presence of said James E. Dale, and at his request; and he wished his brother and sister to have it." About six hours after this occurrence Dale died of the disease from which he was then suffering.

This is an action brought by his brother and sister, to recover the value of the gold dust and coin, after conversion, from the administrator, into whose hands it has come. The question is, whether these circumstances establish a *donatio causa mortis.*

The plaintiff in error, who was defendant below, founds an argument on the word " effects ;" that it was a nuncupative disposition of his whole estate, and not a mere gift of the gold dust and coin. This question was properly submitted to the jury, and they found that the words of donation had reference only to the gold dust and coin. And interpreting the words of the dying man by his action,

[Michener v. Dale.]

there is no room to doubt that the *effects* which he meant to give to his brother and sister were what he handed to the sailor.

Though we have derived the name and some of the principles of such gifts from the Roman law, yet we treat them with less favor than they enjoy in that system of jurisprudence, because it is the policy of our law to require all testamentary dispositions to be in writing. Our statute of wills does indeed provide for nuncupation in respect to personal property, but surrounds it with so many requisites and restrictions (all which we hold to be indispensable, Haus *v.* Palmer, 1 *Am. L. R.* 635) (9 *Harris* 296), that it is scarcely more than a nominal exception to the general rule that testaments must be written. And I agree it is a fair principle of decision, as suggested in Headley *v.* Kirby, 6 *Harris* 329, that we take our statute of wills as a general rule, and treat *donationes mortis causa* as exceptions which are not to be extended by way of analogy. It results, thence, that nothing can be sustained by way of *donatio causa mortis*, that is not strictly and purely such.

*Donatio causa mortis* is a gift of a chattel made by a person in his last illness, or in *periculo mortis*, subject to the implied conditions that if the donor recover, or if the donee die first, the gift shall be void.

In this definition I have followed, substantially, C. J. Tilghman in Wells *v.* Tucker, 3 *Bin.* 370, and the English cases collected in 6 *Bac. Abridg.* 162; but I am aware that in Nicholas *v.* Adams, 2 *Wh.* 22, it was criticised by C. J. Gibson, who quoted from Justinian's Institutes to prove that there was nothing about *sickness* in the primitive definition, and to deduce what he considered the proper definition—a conditional gift dependent on the contingency of expected death.

I am far from thinking definitions unimportant, for, in the law as in all other sciences, they are the very keys to accurate knowledge; but the difference between these definitions is not material as applied to the case before us, for, according to either or both of them, a good *donatio causa mortis* was made by Mr. Dale. It was a gift in his last sickness, and in view of expected death; and the donees surviving him, the implied conditions were taken away and the gift became absolute. Delivery was indispensable, but whether made to the donee immediately, or to another for him, was held to be immaterial in Drux *v.* Smith, 1 *P. Wms.* 404. The delivery to Lent was all that the law required.

And it was the completeness of this delivery in execution of the gift, which excluded the rights of the administrator. A gift is an executed contract. It may be defeated by conditions subsequent; but it must vest presently or it is nothing, for a mere promise to give cannot be enforced either at law or in equity. When a chattel has been given *causa mortis*, possession delivered, and death has performed the condition subsequent on which it depended, no title what

[Michener *v.* Dale.]

ever in that chattel descends to the executor or administrator, and he has no right to the possession of it for purposes of administration. If the title of the donor be so effectually divested by a gift *causa mortis* that he cannot affect it by his subsequent will, as was held in Nicholas *v.* Adams, 2 *Wh.* 23, then, beyond controversy, his personal representative can take no interest in it. The donee, it is true, must account for the value of the chattel, if creditors appear and there be not estate enough beside to satisfy them, for in no manner whatever can a man, living or dying, give away his estate in fraud of creditors. The law compels him to be just, before it permits him to be generous. But until the donation is needed to satisfy creditors, the donee is entitled to enjoy it, and it is not subject to the ordinary course of administration : *Roper on Legacies*, p. 3 ; Tate *v.* Hilbert, 2 *Vesey, Jr.* 120 ; Walter *v.* Hodge, 2 *Swans.* 98.

It was greatly insisted on in argument that the Court ought to have instructed the jury that if the gold was the *principal* part of Mr. Dale's property, he could not make a *donatio causa mortis* of it, and for this Headley *v.* Kirby was relied on. In that case there was a variety of chattels—they were not specified by the donor—nothing more than a constructive delivery occurred—the language was evidently testamentary—and it referred expressly to all her property. In these particulars the case is broadly distinguished from the present, and it does not decide that where a single chattel is the whole of a man's estate, or the "principal part of his property," it may not be given *causa mortis.* The doctrine of that case, predicated of the circumstances then before the Court, is not to be questioned, for it rests on sound reasons ; but, if applied to a case like this, it would defeat all gifts made as memorials of gratitude and affection in the most solemn circumstances of life. It is due to the sensibilities of our nature that the law permit, under proper limitations, such expressions of a dying man's regards. Many a chattel of small intrinsic worth has been thus impressed with an unspeakable value, which it would be a sort of sacrilege to subject to inventory, appraisement, and sale in open market. The Court did not charge that a man could dispose of his whole estate as a gift *causa mortis ;* and if the gold dust and coin were the principal part of the decedent's property, we see nothing on the record to impeach it as a *donatio causa mortis.*

The property having been converted, and its equivalent only being in the hands of the administrator, the action was well brought in *assumpsit ;* and because the title of the plaintiffs was joint, the implied promise followed it, and they were properly joined to sue upon it.

Though the fourteen errors assigned have not been discussed in order, it is believed the substance of all of them has been disposed of in these observations, and the judgment is affirmed.