Hatch *v.* Atkinson.

MARY ANN HATCH *versus* THOMAS ATKINSON & *Trustees*.

To establish a gift *causa mortis*, the common law requires clear and unmistakable proof, not only of an intention to give, but of an actual gift perfected by as complete a delivery as the nature of the property will admit of.

The delivery of the key of a trunk containing money and government bonds, is not a valid delivery of the money and bonds.

The donee must take and retain possession till the donor's death.

ON MOTION to set aside the verdict as being against law and the weight of evidence.

ASSUMPSIT to recover the value of certain money and government bonds, alleged to have been given to the plaintiff by Dr. Bayles Atkinson, in apprehension of death.

The plaintiff testified, *inter alia*, that Dr. Atkinson was confined to his house about three weeks, and died Tuesday, January 16, 1866; that she came to his house a year previously; that she was with him as nurse until he died; that the first week he was confined to the house, he told the plaintiff to take his trunk and money, put it into her room and keep it; that he said that, in all probability, he never should be any better; that he said no more at that time and that nobody but the Doctor and herself were present.

That, about six o'clock, on the evening before he died, they had another conversation, when her brother William was present; that the Doctor was sitting up and he then requested her to bring his trunk with his money; that she did so and put it on the table beside him, where he was sitting; that he and her brother looked it over together; that he then told my brother to take care of it for her; that "this is for Mary Ann," and he wanted him to take care of it for her; that he said to her brother,—"as you hope for prosperity in this world and peace in heaven, do right by Mary;" that she had done more for him than any of his folks had done; that he said to plaintiff,—"I have done better by you than you have any idea of;" that she looked

on and saw the Doctor and her brother count the gold, greenbacks and bonds; that she did not know that the Doctor made any memorandum of the amount at the time; had no other conversation with the Doctor during his sickness about his money and trunk; that the Doctor put the money and bonds back into the trunk; that her brother William took the trunk, put it into a clothes closet in the Doctor's room, occupied exclusively by him; that she saw the trunk in the closet repeatedly afterwards until January 24, when it was taken away by the defendant; that the contents of the trunk were not disturbed between 16th and 24th of January; that her brother and his wife stopped at the house three or four days after the Doctor died, when they went home; that one Wilder and his wife and child, and the Doctor and plaintiff composed the family prior to Doctor's death; that the Doctor gave her the furniture in his room, including secretary and map, just before he gave her the money; that the defendant was stopping at the house when the money was given to him; that he stopped there a fortnight; that she mentioned to defendant some of the things in the room given her by the Doctor, but never said anything to him about the money, bonds or trunk; told him the Doctor gave her the secretary and map; and that the defendant gave her no chance to converse with him; that she wrote the letter of Feb. 8, 1866, to John Atkinson; and that the Doctor gave to her brother William a bunch of keys, — keys of his room, secretary and trunk.

*William B. Hatch*, testified, among other things, that he was at Doctor Atkinson's, Sunday, January 14, 1866, when the Doctor had an ill-turn; that when he revived witness asked the Doctor if he had anything to say to him; that the Doctor replied, — he had a great deal; that the Doctor then said to the plaintiff — " I want Will, (calling witness Will,) to have my keys and money;" that the plaintiff left the room and soon returned with a trunk and keys, and put them on the table near where the doctor was sitting; that the doctor and witness then looked over the

money; that the Doctor locked the trunk and gave witness the key and said, — "I want you to keep it for Mary, — as you hope for prosperity here and peace hereafter, do right by your sister Mary;" that witness took charge of the money and keys; that the funds consisted of government bonds, greenbacks and gold, amounting to $6,390; that he kept possession until Jan. 24, 1866, when he delivered trunk, money and keys to the defendant, telling him at the same time, that the Doctor had disposed of part of his property.

The defendant put in certain letters, the material parts of which will be found in the opinion.

The defendant testified, among other things, that W. B. Hatch told him that the Doctor had disposed of a part of his property; that he had given a house to John Wilder and a part of the things, naming them, in the Doctor's room to the plaintiff; that no allusion was made to the gift of the bonds, or money; that the plaintiff claimed the things in the Doctor's room and took them, but never claimed the bonds or money of the defendant; that he was appointed administrator of the Doctor's estate in March, 1866.

*Granger & Walker*, for the plaintiff.

*Bradbury & Bradbury*, for the defendant.

WALTON, J. — Gifts *causa mortis* are not favored in law. They are a fruitful source of litigation, often bitter, protracted and expensive. They lack all those formalities and safeguards which the law throws around wills, and create a strong temptation to the commission of fraud and perjury. Lord HARDWICK declared, more than a hundred years ago, that it was a pity the statute for the prevention of frauds and perjuries did not set aside all such gifts. Justinian was so justly apprehensive of fraud with respect to them, that he required them to be made in the presence of five witnesses. If the law limited such gifts to articles of small value, and required the gift to be executed in the presence of disinterested witnesses, they would be less objectionable.

But if large estates, amounting to thousands of dollars, may be thus disposed of, and the title of the donee supported mainly by his own testimony, and that of near relatives, the public feeling of security may well be startled.

Unfortunately the common law has not adopted any of these precautions. It does not require the gift to be executed in the presence of any stated number of witnesses; nor does it limit the amount of property that may be thus disposed of. But it does require clear and unmistakable proof, not only of an intention to give, but of an actual gift, perfected by as complete a delivery as the nature of the property will admit of. It not only requires the delivery to be actual and complete, such as deprives the donor of all further control and dominion, but it requires the donee to take and retain possession till the donor's death. Although the delivery may have been at one time complete, yet this will not be sufficient, unless the possession be constantly maintained by the donee. If the donor again has possession, the gift becomes nugatory. And public policy requires these rules to be enforced with great stringency, otherwise the wholesome safeguards of our testamentary laws become useless. It is far better that occasionally a gift of this kind fail, than that the rules of law be so relaxed as to encourage fraud and perjury.

The plaintiff claims title to the property sued for by gift. In support of her claim, she testifies that, some two or three weeks before the Doctor died, he told her to take his trunk and money and put it in her room and keep it; that he did not think he should ever be any better. But there is no evidence that either the trunk or the money was then present, or that she then, or at any subsequent time, actually took them into her custody or keeping. Here, then, is no evidence of delivery. Nor does the language used, if accurately reported, necessarily import even an intention to give. The witness swears that he said nothing more. It seems to us quite as probable that nothing more was meant by this simple request than that his trunk, containing not only his

money but other valuable papers, should be taken care of for him, as that he intended to make a final disposition of more than half the earnings of his entire professional life. This evidence, therefore, assuming it to be true, not only fails to establish a delivery, but it is not satisfactory even of an intention to give.

But it is said that, if what took place at the time above referred to, was not sufficient to establish the alleged gift, what was said and done the night before the Doctor died was sufficient. To this transaction the plaintiff and her brother are the only witnesses. The plaintiff testifies that the Doctor told her to bring his trunk; that she did so, and placed it on the table beside him; that he and her brother then looked it over together; that he then told her brother to take care of it for her; that it was for her; that he wanted him to take care of it for her; that he charged him, as he hoped for prosperity in this world and peace in heaven, to do right by her; that her brother took the trunk and put it into a closet in the Doctor's room; that this closet was used by the Doctor as a clothes press; that the trunk remained there till after the Doctor's death. The plaintiff admits, on cross-examination, that " the Doctor had other papers in the trunk."

Giving full credit to this statement, does it show such a delivery, such a continued possession in the donee, as the law requires to sustain a gift *causa mortis?* Clearly not. The trunk, with all its contents, was left in the Doctor's possession. Its place of deposit was the Doctor's own clothes press, in his own room, and under his own eye ; and there it remained till after his death, when it was taken by the defendant, (afterwards appointed administrator,) without objection from any one. While the Doctor lived, the trunk and its contents were legally and actually in his possession ; as much so as they could be, unless he actually held them in his hands.

*Bunn* v. *Markham*, 7 Taunt., 224, (2 E. C. L., 81,) was much stronger for the donee than this, and yet the Court

Hatch *v.* Atkinson.

held the delivery insufficient. In that case, Mr. Bunn, supposing he was *in extremis*, caused India bonds, bank notes, and guineas to be brought out of his iron chest and laid on his bed; he then caused them to be sealed up in three parcels, and the amount and names of the donees written on them; he then delivered them into the hands of his son, and charged him to deliver them to the donees after his decease; he then directed the son to replace them in the iron chest, and the donor afterwards delivered the key of the chest to one of the donees, and charged her to keep it, telling her that the contents of the chest were to be hers and her daughter's; and many times afterwards declared that the money in the chest was theirs; but, on learning that the key had been obtained by his eldest son, expressed great displeasure, and caused it to be placed in a basket, with other keys, which was always kept in his bedroom; the parcels and the property therein continued in the same state, until after the donor's death; and the Court held that this was not a good *donatio causa mortis*, for want of a sufficient delivery and continuing possession. It was argued that, if the delivery was complete, a continuing possession in the donee was unnecessary; but Chief Justice GIBBS replied that all the cases agreed that, if the donor resumed the possession, it ended the gift.

In *Powell* v. *Hellicar*, 26 Beavan, 261, the deceased, immediately before her death, told one to take the key of a dressing case and box, containing a watch and trinkets, and immediately upon her death to deliver them to the plaintiff, but it was held that this did not constitute a valid gift, *causa mortis*, there being, during the life of the donor, no delivery to or for the donee. Delivery of the key was not sufficient.

Chancellor KENT says delivery is essential, whether it be a gift *inter vivos* or *causa mortis;* that the delivery must be actual; that the necessity of such a delivery has been maintained in every period of the English law; that *donatio perficitur possessione accipientis* was one of its ancient maxims;

and that the subject of the gift must be certain. (2 Kent's Com., 438, L. & B's ed., 589.) Delivery, in this, as in every case, must be such as the nature of the property will admit of. It must be an actual delivery so far as the property is capable of an actual delivery. If the property be not capable of an actual delivery, there must be some act equivalent to it; and the donor must not only part with the possession, but with the dominion of the property. (Ib., 590.)

The property claimed to have been given, in this case, was gold coin, greenbacks, and government bonds, articles capable of a perfect and complete delivery. The Doctor took the gold, and the greenbacks, and the bonds, into his own hands, and looked them over, and could have delivered them into the hands of the donee if he had chosen so to do; but he did not. So far as appears, not one of the bonds, or one of the greenbacks, or a piece of the coin, was ever in her hands, or the hands of her brother. The Doctor replaced the whole in his trunk, locked it, and the trunk was then placed in his own clothes press in his own room, where it remained till after his death.

True, the plaintiff swears, that the Doctor passed the trunk into her brother's hands when he said "this is for Mary Ann, take care of it for her;" but the brother swears that the Doctor "locked the trunk and gave him the key," and said "I want you to keep it for Mary." Which is right, the plaintiff or her brother? It is not material. If it was the trunk, as the plaintiff swears, the possession was not retained by the brother; it was but momentary; for it was immediately placed in the Doctor's own closet, where it remained under his own eye, and under his dominion and control, till his death. If it was the key only, as the brother swears, then very clearly there was no delivery or possession given, even for a moment. For, although delivery of the key of a warehouse, or other place of deposit, where cumbrous articles are kept, may constitute a sufficient con-

Hatch *v.* Atkinson.

structive or symbolical delivery of such articles, it is well settled that delivery of the key of a trunk, chest, or box, in which valuable articles are kept, which are capable of being taken into the hand, and may be delivered by being passed from hand to hand, is not a valid delivery of such articles. The rule is that the delivery must be as perfect and complete as the nature of the articles will admit of. While a constructive delivery may be sufficient for large or cumbrous articles, it will not be sufficient for small articles, capable of a more perfect and complete delivery. Assuming, therefore, that the testimony of the plaintiff and her brother is perfectly reliable, it fails to prove her case, and the presiding Judge would have been justified in ordering a nonsuit.

But we think the testimony of the plaintiff and her brother is not reliable. It is so at variance with their conduct and declarations, that it is impossible to credit it. If the plaintiff understood this property had been given to her, how was it possible for her to write such a letter as she did to John Atkinson?

"The Doctor was never afraid to trust us with any of his property. He gave brother the keys to take care of until some one had a right to search his things."

Is not this language utterly inconsistent with the idea that the Doctor gave William the key and told him to take care of it for the plaintiff? Again:

"He [the Doctor] always told me I should be provided for when he was taken away; and the night before he died he looked up to me and said, ' Mac,' (that is what he called me,) ' I have done better by you than you have any idea of,' and several other things, that I knew he left something for me; but nothing has come to light yet, and, if Thomas has got it, I dont think it ever will; but I shall always think there is something for me."

Always *think* there was something for her! Why, if she and her brother were eye and ear witnesses to the gift now set up, a gift consisting of gold coin, greenbacks, and gov-

ernment bonds, amounting to over five thousand dollars, did she not *know* it? Why then did she say nothing had come to light, and express fears that nothing ever would come to light? While rehearsing the utterances of the Doctor the night before he died, why did she omit all that was most material (if what she now swears to is true,) and rehearse only that which was comparatively immaterial?

The defendant came to the house a week after the Doctor died and remained there a fortnight. He came for the avowed purpose of looking after the Doctor's property and settling the estate. If it was true that this property had been given to the plaintiff, why did she not notify the defendant of the fact? Why did she remain silent when it was so important to herself, as well as others, for her to speak?

Feeling the force of these inquiries, she undertakes to excuse herself by saying that the defendant did not give her a chance to converse with him. But this seems to us a very flimsy excuse. They were in the house a fortnight together, and she admits she mentioned to him some things in the room that the Doctor gave her; that she told him the Doctor gave her the secretary and a map. It is not true, therefore, that she did not have an opportunity to converse with him. She not only had such an opportunity, but did in fact converse with him. Was it any more difficult to inform him of the money and bonds than it was of the map and the secretary?

If it be true that her brother was a witness to this gift, and had been made the depositary of it, under a solemn charge to keep it for the plaintiff, " as he hoped for prosperity in this world and peace in heaven," why did he surrender the property to the defendant without a single word of protest, and without even informing him of the fact that it had been given to Mary, and entrusted to his care for her?

There is but one rational answer to these inquiries; the pretended gift was an afterthought. The testimony in relation to it is so improbable in itself, so hopelessly irrecon-

cilable with the acts and declarations of the witnesses, that a verdict predicated upon it ought not to stand.

*Motion sustained.*

*Verdict set aside.*

*New trial granted.*

APPLETON, C. J., KENT, BARROWS and DANFORTH, JJ., concurred.