Stewart's Estate.

Argued September 30, 1932. Before Frazer, C. J., Simpson, Kephart, Schaffer, Maxey, Drew and Linn, JJ.

*Oliver K. Eaton,* for appellant.—Decedent did not relinquish "all present and future dominion and control" over the notes and, therefore, the surrender was not so complete as to amount to a gift: Bond v. Bunting, 78 Pa. 210; Fross & Loomis's App., 105 Pa. 258.

The donees did not, under the evidence in this case, secure the immediate right "to the entire dominion over the subject of the gift, the perfect title which is as good against the donor as anyone else," and therefore there was not complete delivery: Hafer v. McKelvey, 23 Pa. Superior Ct. 202.

*John E. McCalmont,* for appellee, cited: Yeager's Est., 273 Pa. 359; Vaughn v. Vaughn, 217 Pa. 496; Allshouse's Est., 304 Pa. 481; Locke v. Trust Co., 306 Pa. 478; Vogan v. Jordan, 92 Pa. Superior Ct. 519; Com. v. Crompton, 137 Pa. 138; Potter T. & T. Co. v. Braum, 294 Pa. 482.

OPINION BY MR. JUSTICE SIMPSON, November 28, 1932:

The executors' account in this estate showed a balance due to them. The auditing judge surcharged them in the sum of $23,000, which provided a balance for distribution among creditors. The court in banc sustained exceptions to the adjudication, struck down the sur-

charge and confirmed the account as originally filed. The widow, who was also a creditor, prosecuted this appeal.

The essential facts are as follows: In 1905, testator took out two twenty-year profit-sharing endowment policies of insurance, aggregating $25,000. At that time they were made payable to his children should they survive him, but it was expressly provided therein that he had the right to change the beneficiaries. He subsequently exercised this reserved right by making his estate the beneficiary. As he survived the date of maturity, their then value, amounting together to $29,826.50, was paid to him. This money was his; his children had no claim on it, and so appellees admit. At that time he was solvent, but he was on the down grade financially, if not morally, and was, by various and devious methods, putting his assets out of his own name, though still belonging to him, in order that his wife, who had brought an action against him for divorce from bed and board, because of his misconduct, could not get any part of his estate. This is shown clearly by his own letters written at that time.

Of the $29,826.50, he used $9,826.50 in some unstated way, and disposed of the $20,000 as follows: He handed that amount to one of his daughters, together with a two-year note of his for $3,000, and received from her three two-year notes for $8,000, $8,000 and $7,000 respectively, without interest, drawn to his own order, but later endorsed, one each to each of his children. It is said he handed the $20,000 to the one daughter, because she "was contemplating the building of a home," but to what extent this was contemplated and whether or not it was ever built does not appear; nor is there any evidence, by any one present at the time, as to what occurred between testator and his daughter at the time the $20,000 was given to her.

Appellees frankly say: "On the question of the division of the proceeds of the life insurance policies and

the three notes, we have only the testimony of Walter A. Scott, the custodian," who was also testator's son-in-law, his business adviser in real estate matters, and one of his executors and trustees. He says testator handed the notes to him, said they were "his own, when he turned them all over" to the witness, and asked him to act "as custodian, indefinitely;...... there was nothing said about delivery......at any time," he never directed their delivery, nor was the witness "told not to deliver" them. He further says testator told him, however, that the $23,000 was "part of the proceeds of his policy [of insurance as above set forth] of which his children were the beneficiaries......and that he intended the money to go to them," "he felt it belonged to them." It was not said that he ever carried this intention into effect, but the witness says testator told him to give the notes "to the respective ones" presumably the endorsees; but when or under what circumstances they were to be given was not stated; and, since the witness also said that testator never directed their delivery, and nothing was said about delivery at any time, what he did say was necessarily but the expression of an intention to give in the future, not a present gift.

The witness further said that at the time testator handed to the daughter the $20,000 and a note for $3,000, to make up the difference between the $23,000 of notes given by her and the $20,000 she received, "in lieu of that [i. e., grammatically, of the $3,000 note, but probably meaning the entire transaction, the daughter] turned over the rents on the Callowhill Street property [belonging to her] to him and instructed us [the witness's business firm] to pay it to him; there was no definite time set; I imagined at the time it was possibly for the duration of these notes, but there was nothing mentioned."

When the notes matured at the expiration of two years, nothing was said about them. They remained in the custody of the witness, the endorsees did not demand them from the witness, and the net rents of the Callow-

hill Street property were paid to testator as theretofore. This continued until he died three years later. The excuse given by the witness as to why the matter was not closed out at the expiration of the two-year term, is because "the transaction was not entirely settled," in that it was not convenient for testator to pay his $3,000 note, nor for the daughter to pay her $23,000 of notes. This, however, was a weak excuse and not a real reason. No inconvenience could possibly have arisen by settlement at that time. The witness had the $23,000 of notes given by the daughter to testator, and she had a $3,000 note given by him to her. The latter could have been cancelled by applying it as payment on account of the former, the credit, if necessary, being made on the note endorsed to this particular daughter, and the $8,000, $8,000 and $7,000 notes being then delivered to the particular endorsees.

Appellees attempt to get over these difficulties by saying that the son-in-law was to hold the notes for testator for life, with remainder to the endorsees. This is ingenious but lacks basis. There is no testimony from which such a conclusion could properly be drawn. The following question and answer is pointed out: "Q. Did Mr. Stewart [testator] give you any direction as to the delivery of the notes after the original delivery in 1925? A. That they should go to each one as they were made out to." He did not say when, and this testimony cannot possibly have the effect sought to be given to it, in view of the two immediately succeeding answers by the same witness: "Q. Were those notes discussed between you and [testator] subsequent to the delivery to you in 1925? A. He said that he had, that he [and his daughter] had signed the notes, and he came up to my house after that and turned them over to me. Q. Did you discuss the notes after that, after they were turned over to you? A. No, sir." And again: "A. He gave them to me as custodian, indefinitely. Q. No time was set? A. No. Q. Therefore, there was nothing said about deliv-

ery? A. No. Q. At any time; is that right? A. Yes, sir."

We have gone over the testimony of this one witness again and again, in view of appellees' statement that it is their sole reliance for proof of a consummated gift, and can only conclude that it is to no small degree tinctured by the witness's interest; that he is interpreting testator's statement that he "intended" to give these notes to his children to mean that he then and there did give them, although he never actually did; and that he, the witness, feels bound to carry out that intent, because he believes the testator would wish it, were he now here. And we are clear, also, that this plan, evolved by testator, was one of the ways adopted by him to hinder his creditors, of whom there were many, from getting any part of his estate, despite his legal duty to be just before he is generous.

The authorities upon the question involved are clear. In Campbell's Est., 7 Pa. 100, 101, we said, in an opinion by Chief Justice GIBSON: "A gift is a contract executed; and, as the act of execution is delivery of possession, it is of the essence of the title...... The gift of a bond, note or any other chattel, therefore, cannot be made by words in futuro, or by words in præsenti, unaccompanied by such delivery of the possession as makes the disposal of the thing irrevocable...... Nor is the consideration of blood, or natural affection, sufficient to support a promise to give."

In Clapper v. Frederick, 199 Pa. 609, 613-614, it is said: "Without a complete delivery during the lifetime of the donor, there can be no valid gift inter vivos. 'Though every other step be taken that is essential to the delivery of the gift, if there is no delivery, the gift must fail. Intention cannot supply it; actions cannot supply it; it is an indispensable requisite, without which the gift fails, regardless of consequences:" Thornton on Gifts, etc., page 105...... The mere fact that the notes were drawn in the names of the proposed donees, without

actual delivery to them or proof that they passed into the hands of the depositary for that purpose, and that immediate gifts were contemplated, did not divest the title of the donor, but her dominion over the notes and the fund continued: Scott v. Lauman, 104 Pa. 593, supra, and the case therein cited. If it was intended, as the plaintiff contends, that the notes should not be delivered until after Mrs. Clapper's death, the intended gifts necessarily failed, and delivery thereafter was unavailing: Trough's Est., 75 Pa. 115." The first part of the above is quoted with approval in Allshouse's Est., 304 Pa. 481, 487-8, and this is added: "The consequence is that no matter how often or how emphatically the desire or intention of the donor to make the gift has been expressed, upon his death before delivery has been completed, the promise or purpose to give is revoked: Scott v. Lauman, 104 Pa. 593; 28 Corpus Juris, page 651."

The language in Corpus Juris, in the place last referred to, is as follows: "An unexecuted gift is revoked by the death of the donor. Thus, where a donor delivers property to a third person for the donee, with authority to deliver it to the latter, until the authority is executed and the article delivered, such depositary is the agent of the donor, and the latter may revoke the gift and reclaim the property, and where such delivery does not take place in the donor's lifetime, his death revokes the agency, and no delivery therafter is valid." Admittedly that is the exact situation here. ·

In the present case the son-in-law, who had possession of the notes, was unquestionably acting for testator, at least in part, whether he was or was not acting for the endorsees. He nowhere clearly avers he was acting for them also, but, assuming that he was, then, under the authorities cited,—to which may be added Sears v. Scranton Trust Co., 228 Pa. 126, 141, and Lewis v. Merryman, 271 Pa. 255, 258,—the authority given or agency created by testator ended when he died, no later delivery

could be legally made to the endorsees,—indeed, so far as appears, none was made,—and the notes continued to be the property of testator's estate, as the auditing judge held they did.

We have not overlooked the case of Yeager's Est., 273 Pa. 359, 362, upon which appellees greatly rely. It holds that in gifts from parent to child, "less evidence is required to establish the intention," than in ordinary cases. But this means an intention compatible with immediate performance, for, as is there said also, "To establish a gift inter vivos......two essential elements must be made to appear; an intention to make the donation then and there, and an actual or constructive delivery at the same time, of a nature sufficient to divest the giver of all dominion, and invest the recipient therewith." Here, admittedly, the recipient was not to have any interest, and the question as to whom he was to hold the notes for, was the real issue to be decided. We are satisfied that he was to hold them for testator, until such time as later instructions were given in regard to their delivery, and none such were ever given.

The decree of the court below is reversed and the adjudication of the auditing judge is confirmed.