Elliott's Estate.

Argued March 23, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Linn Voorhees Phillips,* with him *Anthony Cavalcante,* for appellant.

*Jos. W. Ray, Jr.,* of *Shelby, Hackney & Ray,* with him *Levin Smith, Haskell, Kelly & Maher* and *Ernest M. Dunn,* for appellees.

OPINION BY MR. JUSTICE DREW, June 30, 1933:

Clarence V. Elliott died October 24, 1931, intestate, unmarried, and without issue, but leaving a number of collaterals to survive him. Letters of administration were granted to Clarence C. Gallagher and William Alt. The administrators, in their account, awarded the entire estate to the relatives. The appellant, Mrs. Teresa Salandra, claimed a part of the estate as a gift causa mortis. From the decree of the court below dismissing her exceptions to the account, and confirming it absolutely, she took this appeal.

Elliott seems to have been a man of considerable ability; from 1902 to the day of his death he was employed by the West Penn Power Company, at first as construction engineer and later as consulting engineer. During all this time he lived at a boarding house in the City of Connellsville, and for the last ten years of his life this place, his only home, was conducted by appellant and her husband, Mr. and Mrs. Salandra. Elliott lived practically as a member of their family, always called appellant "Mammy," ate at the family table, and spent much of his time, including Christmas and other holidays, with them. His only blood relations were distant relatives, with whom he maintained no contact.

On the Wednesday before his death he returned from work complaining of feeling ill. Appellant called decedent's physician, Doctor Fosselman, who came about nine o'clock that evening and found him a very sick man, with a blood pressure of 240. The doctor immediately urged him to go to the hospital, but he refused to do so. The doctor called again shortly before midnight, and again the next day, Thursday, about eight or nine o'clock in the morning. What happened at that time is best stated in the words of Doctor Fosselman himself: "Thursday morning the only thing he complained of was headache, and I told him he wouldn't get a bit better, and I took his blood pressure and it was practically the same, and I told him, 'You have got to go to the hospital and we will do all we can for you,' and he let out a few oaths and said he wouldn't go, and I said, 'You are going to die,' and he said, 'If I die I die right here with Mammy.' ...... I said, 'You should go to the hospital; do you have any relatives?' and he said, 'I do not,' and I said, 'Do you have anything?' And he waited a while and he said, 'Yes, I have something'; I said, 'What?' He said, 'I have money in banks and in my office and in my room here I have things that I prize highly.' Q. What else did he say with reference to what he had? A. He said if he was going to die he would die there; he had a

bunch of keys on his suspenders and he took the keys off and gave them to Mrs. Salandra, and he said, 'If I am going to die everything I have belongs to this woman,' and he slapped her on the back."

This testimony of the doctor was not controverted or impeached in any way, and it was corroborated in its entirety by the testimony of a negro servant who was present at the time. Thursday evening Elliott's condition was worse, and on Friday morning the doctor, finding him in a condition of stupor, had him taken to the hospital without his knowledge. On Saturday morning, shortly after three o'clock, he died.

After Elliott's death, two of his fellow employees called at his rooms seeking information which would aid them in making arrangements for his funeral. These men were later appointed administrators of his estate. Upon request, appellant delivered to them several bunches of keys. One of the keys opened his safe deposit box, in which was found property valued at $21,104, including $1,000 in cash, a Liberty bond, and various stocks. Appellant (who of course testified only as to matters occurring after Elliott's death) stated that among the keys which she had were those for his office, and the desk therein, but none of the keys which she produced opened the desk, and it was necessary to force it open. In the desk were found bank books showing that decedent had to his credit savings deposits of $56,-058.60, and $6,769.46 in checking accounts. These bank deposits and the items in his safe deposit box constituted practically his entire personal estate, which was appraised at $84,260.02.

Appellant contends that on the above recited facts, which comprehend substantially all the testimony given, a gift causa mortis by the decedent of so much of his property as could be reached by the keys he delivered to her is conclusively established. The court below held that the evidence was insufficient to meet the burden of proof resting upon appellant to prove delivery to her

of the keys to his safe deposit box and to his desk. So far as the key to the safe deposit box is concerned, this conclusion is wholly erroneous. The court below found that the proof was not sufficient to establish that any of decedent's property was controlled by the keys the decedent gave appellant. So far as the office desk is concerned, it must be conceded that, in view of the administrator's testimony that he had to break open the desk since none of the keys in appellant's possession opened it, this finding is supported by the evidence. While it is almost incredible that the keys decedent ordinarily carried, which were those he gave appellant, did not include the keys to his desk, the conclusion of the court below that they did not, since supported by evidence, must, under our well settled rule, be accepted as verity. This alone is fatal to appellant's claim to the bank deposits evidenced by the bank books found in decedent's desk. But, so far as the key to the safe deposit box is concerned, the finding of the learned court is directly contrary to the testimony. The servant testified most positively that Elliott gave appellant three bunches of keys, "one out of his pocket and one from his belt and the other out of his coat pocket"; the doctor testified he did not know how many bunches were handed over; the witness Kennell testified that appellant had in her possession "two or three, or there may have been four, but I think there were three" bunches of keys, and that he took the key to the safe deposit box from one of these bunches and handed it to her or May, who later became the attorney for the administrators; appellant testified positively that she had three bunches of keys, that the key to the safe deposit box was on one of these bunches, that she gave that key to May at the bank, and that May opened the box with that key in her presence; May testified that he thought he received the key from her, that it might have been from Kennell, and that he did open the box with the key thus received, in her presence. This testimony, taken in conjunction with Elliott's declaration,

makes the proof of delivery to appellant of the key to the box clear and convincing. The finding to the contrary is without anything in the record to support it.

The court below, as a reason for its conclusion, states: "He [one of the administrators] said he obtained three, four or maybe five bunches of keys, Doctor Fosselman says he saw only one bunch delivered, and the negro servant saw three bunches delivered. On Saturday morning after Elliott's death Cyrus Kennell saw two or three or maybe four bunches of keys in the possession of Mrs. Salandra. Mrs. Salandra gave all the keys to the administrator. No keys were identified as to delivery, nor were any keys offered in evidence in court with a view of identification, to corroborate the claim of a symbolical delivery. ...... In considering the contradictory testimony of the negro servant and the doctor as to the number of bunches of keys delivered, we believe the doctor, being wholly disinterested and outside of the family, with a keener sense of the significance and the force and effect of what was being done, offers more reliable testimony than that of the servant. Because of this fact, we have greater reason to believe one and not three bunches were delivered. With this uncertainty arises doubt, resulting in a guess whether the safe deposit box key was, in fact, delivered; or, if we take Kennell's testimony, there might have been as many as four bunches of keys in Mrs. Salandra's possession, thereby increasing the doubt." This was a misapprehension of the testimony. The doctor said, in answer to a direct question on the point, that he did not know how many bunches of keys were delivered. His testimony in no sense contradicted that of the colored servant, whose testimony was supported by that of appellant and that of Kennell. The testimony leaves no doubt that three bunches of keys were delivered.

A gift causa mortis differs from other gifts only in that it is made when the donor believes he is about to die, and is revocable should he survive. As was said in

Walsh's App., 122 Pa. 177, "A gift is more than a purpose to give, however clear and well settled the purpose may be. It is a purpose executed. It may be defined as the voluntary transfer of a chattel completed by the delivery of possession. It is the fact of delivery that converts the unexecuted and revocable purpose into an executed and therefore irrevocable contract. All gifts are necessarily inter vivos, for a living donor and donee are indispensable to a valid donation; but when the gift is prompted by the belief of the donor that his death is impending, and is made as a provision for the donee, if death ensues, it is distinguished from the ordinary gift inter vivos and called donatio mortis causa. But by whatever name called the elements necessary to a complete gift are not changed. There must be a purpose to give; this purpose must be expressed in words or signs; and it must be executed by the actual delivery of the thing given to the donee or some one for his use. In every valid gift a present title must vest in the donee, irrevocable in the ordinary case of a gift inter vivos, revocable only upon the recovery of the donor in gifts mortis causa." See also McHale v. Toole, 258 Pa. 293. We have frequently stated the elements of a valid gift inter vivos: Yeager's Est., 273 Pa. 359; Kaufmann's Est., 281 Pa. 519; Leadenham's Est., 289 Pa. 216; Allshouse's Est., 304 Pa. 481; Stewart's Est., 309 Pa. 204. "To establish a gift inter vivos......two essential elements must be made to appear: an intention to make the donation then and there, and an actual or constructive delivery at the same time, of a nature sufficient to divest the giver of all dominion, and invest the recipient therewith": Yeager's Est., supra.

Turning again to the facts of the case, every one of the requisite elements of a gift causa mortis appears. The decedent knew he was going to die; he had been plainly told so by his physician, the complete accuracy of whose statement is proved by the fact that he did die less than two days later. In this state of mind, and desiring ap-

pellant, as his good friend for many years, to be the recipient of his property, he handed his keys to her, saying, "If I am going to die, everything I have belongs to this woman." Under the circumstances, these were words of present gift, and they clearly evince an intention to divest himself at that moment of the ownership of the keys and the property to which they gave access. He did this because he thought he was going to die, in which event his property could be of no use to him. Except for the purpose of making a gift, there was no reason for his handing over the keys at that time. He did not give them to her for safe keeping; they were as safe in his room as in any other in the house, and, as he had refused to go to the hospital, he did not give them to her merely to hold for him until his return. The decedent's intention to make a present gift is established beyond a doubt.

As for the delivery of the property given, that is clear. The handing over of the keys with an intent to make a gift was a valid constructive or symbolical delivery of the property to which they gave access. "Constructive delivery is always sufficient when actual, manual delivery is either impracticable or inconvenient. The contents of a warehouse, trunk, box, or other depository may be sufficiently delivered by delivery of the key of the receptacle": Thomas's Adm'r v. Lewis, 89 Va. 1; Leadenham's Est., supra; Harrison v. Foley, 206 Fed. 57; Debinson v. Emmons, 158 Mass. 592; Cooper v. Burr, 45 Barb. (N. Y.) 9; see Coleman v. Parker, 114 Mass. 30; Jones v. Brown, 34 N. H. 439.

As we have seen, decedent's words purported to give to appellant his entire estate. The fact that she claims only a part is because she was unable to prove delivery of the whole. Such a gift was held invalid in Headley v. Kirby, 18 Pa. 326. In that case, decided in 1852, we reversed the District Court of Philadelphia, of which the learned SHARSWOOD was then president judge, and held that a gift causa mortis professing to pass *all* one's pos-

sessions was void because to allow such gifts would practically nullify the statutes concerning wills. A study of that opinion demonstrates that it is unsound. It admits that gifts causa mortis have uniformly been considered an exception to the law of wills, and that, with proper safeguards against fraud, they have been allowed ever since Roman times. If this be true, and it must be conceded, the statutes governing wills have no application to such gifts, and should not be considered in passing upon them. They are outside such statutes, and have never been governed or controlled by them. Two years later, and with only one change in the membership of the court during the interval, Headley v. Kirby was distinguished in Michener v. Dale, 23 Pa. 59, on the ground that it was not intended to apply to the gift of a single chattel, even though it be the whole of the donor's estate or the principal part of his property. This latter decision clearly indicates the extent to which it was necessary for the court to go in order to avoid the logical consequences of the earlier case. There can be no sound distinction between a gift of a part and one of the whole of a donor's personal property. That his whole estate comprises a single chattel does not make a gift of it any the less a disposition of all his property.

Since Michener v. Dale, so far as we know, Headley v. Kirby has never been cited by this court. A diligent search has revealed no decision so holding in any other jurisdiction. There is a dictum approving it in Marshall v. Berry, 13 Allen (Mass.) 43, but the same court refused to follow that dictum in Debinson v. Emmons, supra, and upheld the validity of a gift of two trunks, which, the donor stated, contained all she possessed. In the few cases which have arisen concerning such gifts of the whole of the donor's estate, the doctrine of Headley v. Kirby has always been rejected. In Meach v. Meach, 24 Vt. 591, also decided in 1852, Chief Judge REDFIELD, referring to our decision, said: "As the property in that case was all personal, and what was done might have

been regarded as sufficient to constitute a gift *mortis causa*, it may be somewhat questionable how far a *donatio mortis causa* is to be altogether invalidated, by reason of its embracing the major part, or the whole of one's property, if it be in other respects unobjectionable. Neither the English nor American cases have attempted any such criterion before, and it would seem, at first blush, rather difficult of application." In a note at the end of the printed report of the case the same learned judge added, "Although, in practice with us, this mode of final disposition of property has oftener been confined to some favorite articles of personal attire, or ornament perhaps, like watches and jewels, yet an examination of the cases will show a wonderful variety in the character and extent of property disposed of in this mode, often including all one possesses, consisting of the largest extent and variety of property, both in possession and action; and thus, in fact, amounting to a nuncupative will. And still I find no case, except the late case in Pennsylvania, where any attempt has been made to limit its operation, on account of the comparative or absolute extent of the property disposed of. And the more I have reflected upon the subject and compared the cases, with a view to evolve some rational and practicable principle of limitation to the extent of its operation, the more I have felt constrained to declare that it cannot be done by any powers of abstraction or generalization which my short sight is able to command." In Thomas's Adm'r v. Lewis, supra, the Supreme Court of Appeals of Virginia sustained a gift causa mortis of the decedent's entire estate, saying, "The common law does not limit the amount—absolute or comparative—of the personal estate which may thus be disposed of." As authority for this statement that court cited, inter alia, Michener v. Dale. Other authorities to this effect are Hatch v. Atkinson, 56 Me. 324; Keepers v. Fidelity Title & Dep. Co., 56 N. J. L. 302, and Seabright v. Seabright, 28 W. Va. 412. Headley v. Kirby is not sound law, is illogical in its rea-

soning, and is not in accord with the general law on the subject. The case is, therefore, overruled.

The requisite elements of a gift causa mortis of the cash and securities found in the safe deposit box are present. While decedent lived, he had a right to do with his property as he chose, and his intention to give it to appellant is clear beyond a doubt. There is not even an inference of fraud suggested by anyone. While a gift of this nature is properly the subject of suspicion, where, as here, there is no fraud and no doubt of the intention of the decedent, there should be no hesitation in giving effect to his dying wish.

The decree of the court below is reversed in so far as it denies the right of appellant to the money and securities found in the safe deposit box, together with the dividends which have accrued on these securities since the decedent's death, and they are awarded to her, free of all costs of administration; the costs of this appeal to be paid by the estate.

Mr. Justice LINN dissents.

Mr. Justice KEPHART concurs in the result.