**In re Estate of Plovetsky**

458

C.P. of Cambria County, no. 11-95-432.

*Michael A. Sossong,* for administrator.
*Timothy C. Leventry,* for exceptants.

SWOPE, *J.,* March 7, 1996—This matter involves a dispute between the intestate heirs of the decedent, Paul Plovetsky. Currently before the court are exceptions to the first and final accounting of the administrator of the estate. The exceptants herein are two of the decedent's nieces, Mary E. Petro and Irene Toth. The respondent is Paul V. Freck, the decedent's nephew and the administrator of his estate. All the parties are intestate heirs.

At issue is whether the decedent completed an inter vivos gift of $64,000 to Paul Freck, or whether that money should pass through the estate to the intestate heirs. As will be explained, the court finds that under the law of this Commonwealth, the decedent did not make an inter vivos gift or a gift causa mortis. The court will therefore grant the exceptions to the accounting.

## I. THE FACTS

The court has weighed the credibility of the witnesses in this matter,[1] and finds that the following facts are established by clear and convincing evidence: Paul Plovetsky lived in Portage, Pennsylvania all his life.

---

1. Neither party objected to any of the witnesses' testimony on the basis of the Dead Man's Act, 42 Pa.C.S. §5930. See generally, *Estate of Greenberg,* 298 Pa. Super. 379, 444 A.2d 1224 (1982).

Paul Plovetsky lived with his brother Bill until Bill died in 1988. The exceptants, Mary Petro and Irene Toth, reside in California. The administrator, Paul Freck, resides in Twinsburg, Ohio.

Paul Freck and his wife Marjorie began regular visits with Paul Plovetsky 30 years ago, shortly after they married. The visits increased in frequency and duration as Paul Plovetsky grew older. Mary Petro also visited with her uncle over the years in Pennsylvania and in California, but the visits virtually ceased in the last five years before Plovetsky's death.

During the last 10 years of his life, Plovetsky began giving Paul Freck and his wife Marjorie envelopes containing cash after their visits with him. The first such gift took place in 1985. During that visit the Frecks came to Pennsylvania to take care of Paul Plovetsky's household while his brother Bill was in the hospital. As the Frecks were leaving to return to Ohio, Plovetsky opened his safe and gave Freck an envelope containing cash. Plovetsky then told Freck there was cash in the safe, and said, "I want you to have it when the time comes." He said that in the safe there were envelopes designated by name for certain persons. He then told Freck that all the envelopes of cash in the safe that were not specifically designated as belonging to someone else belonged to Freck.[2] Plovetsky gave Freck the combination to the safe as the Frecks were leaving to return to Ohio. Paul Freck did not open the safe or remove any cash from it.

Between 1985 and 1991 Plovetsky gave Freck cash from the safe on various other occasions when the Frecks visited. When Bill Plovetsky died in 1988 the Frecks again visited. After the funeral, Paul Plovetsky came

2. Transcript of January 24, 1996 at 27-28.

to the Frecks and said that the cash in the safe was theirs "when the time comes."[3] Again, Paul Freck did not open the safe and remove cash from it.

Paul Plovetsky bought a second safe in approximately 1990. One year later he also gave its combination to Freck. Meanwhile, he changed the combination to the old safe and gave Freck the new combination. These actions of Paul Plovetsky made Freck the only person other than himself to know the combination to the two safes. Plovetsky told Freck that he took these steps because he did not want his niece Mary Toth to have the combination to the safes.

By May of 1994, Plovetsky was 86 years old. During the Frecks' visit at that time, Plovetsky again opened the safe that held the cash, and showed its contents to Paul Freck. He told Freck that the cash inside was his. As usual, however, Freck did not open the safe himself or take any cash out of it. Freck instead thanked Plovetsky but insisted that Plovetsky might outlive him and therefore might need it more than he did. At the time, Plovetsky was alert and healthy. At age 86 he was still making repairs to the roof of his house.

Approximately two months later, on July 6, 1994, the Frecks were visiting Plovetsky when Plovetsky again told Paul Freck the cash in the safes was his. He also gave Freck some cash in a plastic bag that day when he left for Ohio. Paul Freck accepted the bag, containing one or two thousand dollars, but once again he neither opened the safe nor removed anything from it. This was to be Paul Freck's last visit with his uncle; Paul Plovetsky suffered a major stroke on July 9, 1994.

The day after he learned of his uncle's stroke, Freck came to Portage. The Frecks, continuing their role as

---

3. Transcript of January 24, 1996 at 41, 131.

their uncle's primary caregivers, decided to take Plovetsky to a hospital in Ohio where they could better care for him. In anticipation of the trip to Ohio, the Frecks went to Plovetsky's house to put his uncle's affairs in order. Because the ambulance would begin transporting Plovetsky to Ohio in less than two hours, and because the Frecks had to be in Ohio to receive Plovetsky, they had only an hour and a half to clean out Plovetsky's house and safeguard his possessions.

For the first time, Paul Freck opened the two safes. One was about one and one-half square feet in size, and the other was slightly larger. Freck emptied the safes' contents into a bag without taking any inventory. In the first safe he found bonds, certificates of deposit, and cash. In the second safe he found papers such as an army discharge certificate, birth certificates of Plovetsky's nephews, the deed for Plovetsky's house and some more cash. The cash in both safes was in various kinds of new and used envelopes. Some envelopes had names written on them, some did not.

Shortly afterward, the Frecks, Paul Plovetsky, and Mary Petro all arrived in Ohio. On October 17, 1994, Paul Freck applied to be guardian of his uncle.[4] Freck did not inventory the assets from the safes until he filed the guardianship application. When he went to the bank to open the guardianship account, he and the bank manager counted the money and inventoried the other assets. The cash in undesignated envelopes amounted to $64,000, and was placed in the guardianship account. The guardianship account was a joint account with right of survivorship in the names of both

4. Mary Petro contested that application and also applied to be Plovetsky's guardian on November 3, 1994. On January 25, 1995, an Ohio court denied Mary Petro's relief and appointed Paul Freck to be Plovetsky's guardian.

Paul Freck and Paul Plovetsky. The social security number which Paul Freck assigned to the account was Paul Plovetsky's.

On February 11, 1995, Paul Plovetsky passed away. After Plovetsky died, Freck removed Plovetsky's name from the account, leaving only his own name. Freck kept the $64,000 in the bank and did not credit it as an asset of Plovetsky's probate estate. All parties in this matter, however, had actual notice of the purported gift.

## II. LEGAL DISCUSSION

This testimony does not establish a legally valid transfer of the money to Paul Freck. Neither the elements of an inter vivos gift nor gift causa mortis have been established. The legal analysis is set forth below.

To prove an inter vivos gift, the following elements must be established: (1) that the donor intended to make an immediate gift; (2) that there was such actual or constructive delivery of the gift to the donee as would divest the donor of dominion and control over the gift, and (3) that the donee accepted of the gift. *Hengst v. Hengst,* 491 Pa. 120, 420 A.2d 370 (1980). The purported donee of an inter vivos gift has the initial burden of proving the elements of a gift by clear, precise and convincing evidence. Once the prima facie elements of a gift are established, a presumption of validity arises and the burden shifts to the contestant to rebut this presumption by clear, precise and convincing evidence. Moreover, a presumptively valid gift may be rebutted by showing that the donor and donee had a confidential relationship at the time of the alleged gift. *Hera v. McCormick,* 425 Pa. Super. 432, 625 A.2d 682 (1993).

In the first place, "donative intent" means that the donor intended to make a gift to the donee immediately,

not at an uncertain future time. *Wagner v. Wagner,* 466 Pa. 532, 353 A.2d 819 (1976). The testimony of Paul Freck plainly shows that the decedent had no such intent. To the contrary, Plovetsky told Freck that the money would be his "when the time comes." In other words, the money was to be Freck's after Plovetsky passed on. Plovetsky's undoubtedly serious intention to give Freck a future gift must be distinguished from an intention to convey the money in the present.

Secondly, the court cannot say that Plovetsky delivered the cash to Paul Freck. Certainly there was no actual delivery of the money to Freck. Unlike the parcels of cash that Plovetsky periodically gave the Frecks after their visits, he did not remove the $64,000 from the safe and hand it to Freck. Nor did Freck open the safe and take it. The money remained in the safe, under Plovetsky's dominion and control.

The more interesting question is whether Freck's possession of the combinations to the safes, coupled with his unfettered access to Plovetsky's house, was a constructive delivery of the $64,000. The general rule is that constructive or symbolic delivery displaces actual delivery only in circumstances where actual delivery is impracticable. For example, a donor's delivery of the keys to a safe deposit box to a donee may in certain circumstances be symbolic delivery of the contents of the box. See generally, *Secary Estate,* 407 Pa. 162, 180 A.2d 572 (1962); *Elliott's Estate,* 312 Pa. 493, 167 A. 289 (1933); *Leadenham's Estate,* 289 Pa. 216, 137 A. 247 (1927); *Leitch v. Diamond National Bank,* 234 Pa. 557, 83 A. 416 (1912).

The analogy between the keys to a safe deposit box and the combinations to the safes is obvious. However, even in cases involving symbolic delivery of assets in safe deposit boxes, constructive delivery must still

divest the donor of exclusive physical control over the contents of the box, and invest the donee with control over the box and its contents. If control is not transferred, constructive delivery is ineffective. *Judson Post Estate v. Commonweath Bank and Trust Company,* 500 Pa. 420, 456 A.2d 1360 (1983); *In re Estate of Evans,* 467 Pa. 336, 356 A.2d 778 (1976). Here the combinations to the safes did not divest Plovetsky of the ability to remove and spend the money in the safe. Indeed, Freck himself said that he would not take the money because Plovetsky might outlive him and need the money himself. Under such circumstances, no symbolic delivery has occurred. *Post Estate, supra* at 423, 456 A.2d at 1361.

Finally, it is not clear whether Freck accepted the gift. Normally, acceptance of a gift is presumed, but the presumption can be rebutted. *Fuisz v. Fuisz,* 527 Pa. 348, 591 A.2d 1047 (1991). In this case, Paul Freck never took sole possession of the cash, nor did he ever attempt to exclude Plovetsky from it. Most likely this is because Freck understood that Plovetsky did not intend to make the gift final until after his death. Where a purported donee fails to take physical possession of a gift at the time the donor purportedly offers it, the court may infer from the lack of acceptance that the donor intended to complete the gift in the future; it may also infer that the purported donee refused to accept the gift. *Id.* The court believes it reasonable to draw these inferences here.

Finally, there is no question that no gift causa mortis took place. A gift causa mortis must not only satisfy the elements of an inter vivos gift, it must also be made by a donor who apprehends imminent death. *Sivak Estate,* 409 Pa. 261, 185 A.2d 778 (1962). The intent element is therefore lacking: there is no evidence at

all that at any time Paul Plovetsky believed his death was imminent. Moreover, the failure to make actual or symbolic delivery will also cause an attempted gift causa mortis to fail. *Fleigle Estate,* 13 Fiduciary Rep. 141 (O.C. York, 1993).

## III. CONCLUSION

As noted above, the court is firmly convinced of the truthfulness of Paul Freck's testimony: Paul Plovetsky intended that upon his death Paul Freck receive the $64,000. The sincerity of Paul Plovetsky's intentions alone, however, was not enough to effectuate them. Gift giving is a deceptively simple method of passing assets to one's heirs. As this case demonstrates, proving a legally valid gift may be more difficult than the donor and donee may ever have considered.

The problem with an attempt to make a future gift is that it neither accomplishes anything in the present, nor does it assure anything in the future. A completed gift transfers assets in the present. A will or a trust guarantees the transfer of assets in the future. The intention to make a future gift, however sincerely held and expressed by the donor, has no legal effect. It is for that reason, and that reason alone, that the court cannot find that Paul Plovetsky gave $64,000 to Paul Freck. Accordingly the following order is entered.

## ORDER

And now, March 7, 1996, it is hereby ordered and decreed that (1) the exceptions to the accounting are granted; (2) Paul Freck owes to the estate of Paul Plovetsky the sum of $64,000 together with all interest accumulated from the guardianship account.